675 S.E.2d 428

**In the Matter of James W. FAYSSOUX, Respondent.**

**No. 26617.**

Supreme Court of South Carolina.

Submitted Feb. 6, 2009.
Decided March 23, 2009.

638

Lesley M. Coggiola, Disciplinary Counsel, of Columbia, for Office of Disciplinary Counsel.

James W. Fayssoux, of Greenville, pro se.

PER CURIAM.

In this attorney disciplinary matter, respondent and the Office of Disciplinary Counsel (ODC) have entered into an Agreement for Discipline by Consent pursuant to Rule 21, RLDE, Rule 413, SCACR. In the Agreement, respondent admits misconduct and consents to the imposition of an admonition, a public reprimand, or the imposition of a definite suspension not to exceed sixty (60) days. We accept the Agreement and impose a public reprimand. The facts, as set forth in the Agreement, are as follows.

## FACTS

Respondent self-reported to ODC that he, along with several other lawyers, numerous non-lawyers, and several business entities had been named as defendants in civil litigation initiated by a lender. Respondent's errors and omissions carrier settled the litigation by paying damages in an agreed amount of $35,000 to the lender.

It is now known that, as a result of a federal investigation, James Byrd, Eric Byrd, and their related business associates and/or entities entered into schemes to acquire and then sell real estate at inflated values to the detriment of the purchasers and to a lender who made loans to those purchasers. Due to those schemes, the lender made loans to persons it would not have otherwise approved. Further, the lender made loans contrary to its policies and procedures and in amounts in excess of its lending policies and procedures which it had in place to promote timely repayment and to prevent default upon its loans secured by real estate mortgages. Subsequently, both the Byrds and others were indicted and sentenced to terms in federal prison for wire, mail, and/or bank fraud.

Respondent represents that he was unaware of any criminal activity in connection with any of the real estate transactions he handled that were arranged by the Byrds. ODC does not dispute this representation. Further, respondent represents that he does not believe that his activities constituted criminal acts and ODC does not dispute this representation.[1]

However, twenty-eight (28) real estate closings which were handled by respondent as arranged by one or both of the Byrds revealed irregularities that ODC contends constitute lawyer misconduct on the part of respondent. With the advantage of information revealed by hindsight and the investigation by the federal authorities and ODC, respondent agrees with ODC's contention.

In one transaction, respondent wrote a check on his trust account payable to Vision Enterprises, an entity known by respondent to be owned and/or controlled by one or more of

---

1. Respondent was not charged with any criminal activity in connection with the transactions reported in this opinion and neither respondent nor ODC expect any charges to be filed in the future.

the Byrds. The check was for the exact amount due to the seller Eric Byrd on a related HUD–1 Settlement Statement prepared by respondent. As a result, the information furnished to the borrower and lender on the HUD–1 contained incorrect information.

In another transaction, Vision Enterprises placed an $18,000 mechanics lien against real property acquired by James Byrd who then sold the same property the next day, paying the mechanics lien out of the proceeds of that sale. Respondent prepared the closing papers and made the disbursements. It is now recognized that Byrd, through his colleague's placement of the mechanics lien, actually placed the mechanics lien against himself and then paid it out of the proceeds of the sale to a borrower and a loan made by the lender, even though little or no repairs were made to the property. ODC contends respondent should have recognized this was a sham mechanics lien because it was placed on property by an entity or person known to respondent to be a Byrd confidant the very day before Byrd and/or a Byrd-controlled entity sold the property.

In several other Byrd-arranged closings, the HUD–1s prepared by or at the direction of respondent showed money being withheld for repairs. It is now known that little, if any, such repairs warranting the amount withheld were actually made. Respondent withheld the funds and paid them over to one or more of the Byrds and/or one or more entities controlled by or having a very close working relationship with the Byrds. In retrospect, respondent now recognizes that, as a result, both borrowers and lenders were acquiring interest in real property at inflated values and/or there was greater consideration begin received by the seller than reflected on the corresponding HUD–1s prepared by respondent.

In three other transactions, respondent's firm's pension and profit sharing plan provided loans in Byrd-arranged transactions (and then sold those properties for a profit). By participating in the transactions, respondent had business dealings with a client without complying with the requirements of the Rules of Professional Conduct.

Further, the properties were sold to Byrd under financing to the pension and profit sharing plan (secured by notes and mortgages to that plan from Byrd or Byrd-controlled entities).

Respondent prepared the closing documents in these transactions and then handled the closings when Byrd sold these three properties to borrowers. Monies from these transactions were applied toward the notes and mortgages, but no mention of the monies being paid to the pension and profit sharing plan of respondent's firm were made on the borrowers' HUD–1s. By omitting the information from the HUD–1s, the information given to the lender and borrowers was not entirely correct. Further, respondent issued title insurance policies that did not make exception to the mortgages, notwithstanding the fact that the mortgages were publicly recorded. These three transactions were the subject of the civil litigation against respondent and the federal indictments against the Byrds and others.

In another transaction, Eric Byrd was the seller and another Byrd business associate was the buyer in the arrangement. Respondent was aware of the relationship between the seller and buyer and closed the transaction. Line 201 on the HUD–1 Settlement Statement (earnest money paid by borrowers) states that $12,000 was paid as earnest money by the borrower when, in fact, no such amount was received by respondent into his firm's trust account and no notation "POC" (paid outside of closing) was made on that line. As a result, the receipts and disbursements made out of respondent's trust account were not consistent with the information on the HUD–1.

In several other matters closed by respondent, James Byrd purchased transactions as refinancings which allowed Byrd to circumvent the lender's guidelines, procedures, and policies applicable to purchase transactions to avoid the lender making loans on property at inflated amounts. In furtherance of this scheme, a Byrd-controlled land trust served as a straw buyer giving a note and mortgage. Respondent was aware that the land trust was a Byrd-related and controlled entity. In hindsight, respondent acknowledges the peculiarities of these transactions should have served as "red flags" that improprieties were being committed in connection with these real estate transactions.

Another Byrd scheme was to make fictitious notes and mortgages from Byrd cohorts as "borrowers" to Next Genera-

tion (an entity known at the time by respondent to be Byrd-controlled). While respondent did not draft these notes and mortgages, in some cases they were drawn and recorded the day before respondent conducted the closings on the encumbered property sold to genuine borrowers. Respondent should have seen additional "red flags" when Byrd left the closing with a check made to the lender, especially when a known Byrd family member was the borrower.

Respondent represents that all checks exchanged during these transactions were honored upon presentment. ODC does not dispute this representation. However, it is now known that personal checks which were brought to closings handled by respondent in some of the transactions by the Byrds or their associates would only be made good out of the proceeds of the ultimate, inflated sales of the subject property.

Toward the end of their relationship, respondent began having concerns about the propriety of the Byrds' transactions. Around the same time, one of the Byrds asked respondent to assist in "flip" transactions; respondent recognized participating in a "flip" transaction would constitute misconduct. Respondent ceased closing transactions for the Byrds.

Respondent has been engaged in the practice of law since 1972. He has no prior disciplinary history. He has fully cooperated with ODC's inquiries into this matter.

## LAW

Respondent admits that his misconduct constitutes grounds for discipline under Rule 413, RLDE, specifically Rule 7(a)(1) (lawyer shall not violate Rules of Professional Conduct or any other rules of this jurisdiction regarding professional conduct of lawyers). In addition, respondent admits he has violated the following provisions of the Rules of Professional Conduct, Rule 407, SCACR: Rule 1.1 (lawyer shall provide competent representation to a client); Rule 1.7(a) (lawyer shall not represent client if representation involves concurrent conflict of interest); Rule 1.8(a) (lawyer shall not enter into business transaction with client or knowingly acquire a pecuniary or security interest adverse to a client unless certain conditions are met); Rule 4.1(a) (in course of representing client, lawyer shall not make false statement

of material fact to a third person); Rule 8.4(a) (it is professional misconduct for lawyer to violate the Rules of Professional Conduct); Rule 8.4(d) (it is professional misconduct for lawyer to engage in conduct involving dishonesty, fraud, or misrepresentation); and Rule 8.4(e) (it is professional misconduct for lawyer to engage in conduct that is prejudicial to the administration of justice).

## *CONCLUSION*

The misconduct reported in this opinion would normally warrant the imposition of a suspension from the practice of law. However, because respondent self-reported his misconduct to ODC, fully cooperated with the disciplinary investigation, and has served the Bar of this State for more than thirty years with no prior disciplinary history, we find that a public reprimand is warranted. Accordingly, we accept the Agreement for Discipline by Consent and publicly reprimand respondent for his misconduct

**PUBLIC REPRIMAND.**

TOAL, C.J., WALLER, PLEICONES, BEATTY and KITTREDGE, JJ., concur.